IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) 2:20-cr-132 |
| JUSTIN McCONNELL, | ) |
| Defendant. | ) |

## OPINION

**J. Nicholas Ranjan, United States District Judge**

    Defendant Justin McConnell moves to suppress physical evidence and incriminating statements stemming from a September 30, 2019, warrantless search by Pennsylvania state parole agents. He argues that the agents lacked reasonable suspicion to initiate the search, exceeded the scope of a reasonable search, and violated his *Miranda* rights. After carefully considering the parties' arguments in briefing, the testimony and exhibits admitted at the evidentiary hearing, and the applicable law, the Court will deny the motion, except as to Mr. McConnell's initial statement that he had airsoft rifles in his home.

## BACKGROUND

    Based on the admitted evidence, including the Court's assessment of the credibility of the witnesses who testified at the November 5, 2021, evidentiary hearing, the Court finds as follows.

    Mr. McConnell was convicted of a state sex offense and imprisoned from July 2007 until December 2015, when he was granted parole by the Pennsylvania parole board. ECF 48-4. Upon beginning parole, he signed an agreement outlining many conditions, including "refrain[ing] from owning or possessing any firearms or other weapons." *Id.* at p. 2. Because of the nature of his offense, the conditions pertaining to children were particularly strict. He could not have contact with any minors

1

without prior written approval.  ECF 48-5, p. 9.  He could not "purchase items designed to appeal primarily to" minors, such as "children's clothing, toys, games, books, dolls, stuffed animals, child-oriented videos, etc."  *Id.*  He could not even possess photos of any minors without written approval.  *Id.* at p. 3.  Mr. McConnell understood that to ensure compliance, Pennsylvania parole agents could search his "person, property and residence, without a warrant[.]"  ECF 48-4, p. 2.  He had an excellent compliance record for the first 45 months of his parole.  *See* ECF 58, p. 69:1-71:3.  That is, he had no disciplinary issues or incidents of technical noncompliance.  *Id.* at 48:23-49:8; 105:23-106:2.

But on Saturday, September 28, 2019, Parole Agent Joseph Eckenrod – who had previously supervised Mr. McConnell for eight months (ECF 58, 122:7-10) – alleged that he saw him at a Harbor Freight store with a woman and "a small child" (ECF 48-3, p. 6).  Mr. McConnell, in fact, was there with his ex-wife Jennifer, purchasing an auger for a home improvement project.[1]  ECF 58, 150:24-121:19; Def.'s Ex. 2; Def's Ex. 3.  Agent Eckenrod purportedly saw the McConnells standing in line with the child.[2]  ECF 58, 108:15-19; ECF 48-3, p. 6.  Then, he claimed to have seen them in the store parking lot "loading the small child in the rear of his vehicle."  ECF 48-3, p. 6; *see also* ECF 58, 110:7-12.  Finally, he reported seeing them driving in the vehicle with the child "at quite a distance."  ECF 58, 109:19-110:1; ECF 48-3, p. 6.  While in his car, Agent Eckenrod called Agent Jim Hauser – Mr. McConnell's current parole supervisor – to report what he had seen.  ECF 58, 110:13-25.  Agent Hauser

---

[1] An auger is gas-powered tool, with a motor and four-foot-long steel corkscrew.  Mr. McConnell planned on using it to drill holes into the ground to install posts or piers under his mobile home.  ECF 58, 167:19-168:9.

[2] Agent Eckenrod never provided any details about the child.  He testified only that the child was "short in stature" and that he believed the child was able to walk.  *Id.* at 108:20-24.

"did not instruct him to do anything" and "told him [he'd] follow up as soon as we're back to work on Monday." *Id.* at 75:2-8.

Two days passed. On Monday, September 30, Agent Eckenrod filed his official report. ECF 48-3, p. 6. The report stated:[3]

> 9/30/2019 10:50 - 11:20 - Contact - Offender/Collateral Field
> Created By: Eckenrod, Joseph L
> Narrative:
> On 9/30/2019 this agent was at Habor Freight tool store. The address of this location is 830 Scalp Ave. The offender was inside of the store with a woman and small child. They had made a purchase before I did. As I stepped from the store the offender was and a woman were loading the small child in the rear of his vehicle. I recognized the offender and vehicle from a period of time that I supervised the offender. The offender was operating a black SUV with a "don't tread on me" license plate on the front of the vehicle. The vehicle is a Honda Soul bearing Pa registration ▇▇▇▇▇▇▇. The offender was parked next to my vehicle. I looked over at him as he looked at me. He was in the driver's seat of the vehicle. The woman he was with was sitting in the front. I remembered this offender was not allowed to have contact with a child do to him being a sex offender. and that his wife and he were involved with Indiana CYS. At one point we were stopped at the intersection of the parking lot of Bella Pizza and Scalp Ave. Both I and the offender made a left onto Scalp Ave. The offender started to drive extremely slow giving the appearance that he wanted distance so I couldn't observe him any longer. While I was observing the offender with the woman and child in the vehicle I contacted Agent Hauser to let him know what I observed.
>
> Created on: 9/30/2019 06:43
>
> Collateral(s)/Other(s)
> Child
> Paramour
> James E. Hauser, Jr, Staff Collateral

After the report was submitted, no other action was taken during the day. *See* ECF 58, 29:6-8, 76:14-25. That evening, Agent Hauser went to visit Mr. McConnell at home. *Id.* at 29:17-18. During their brief discussion, Mr. McConnell strenuously denied that he had been near any child. *Id.* at 77:19-23, 177:1-10. His mother, who was also present, explained that it was impossible because neither Mr. McConnell nor his wife had custody of their children. *Id.* at 176:17-25. Agent Hauser did not search the house or the car at that time. *Id.* at 80:23-81:8. Nor did he ask to see footage from Mr. McConnell's home surveillance system, though he was aware of the

---

[3] This report contained several inaccuracies. It listed the date of the encounter as September 30, rather than September 28. ECF 58, 112:7-21. It indicated that the McConnells were ahead of Agent Eckenrod in line, when subsequent testimony – including Agent Eckenrod's – revealed that they were behind him. *Id.* at 109:9-13. It referred to Jennifer McConnell – whom Agent Eckenrod had met several times and knew to be Mr. McConnell's wife – as 'a woman' and 'paramour,' as opposed to his "wife." *Id.* at 130:3-7. It referred to Mr. McConnell's vehicle as a "Honda Soul," when it was a Kia Soul. *Id.* at 131:6-9. Finally, the report has numerous grammatical and spelling errors.

3

cameras. *Id.* at 81:22-82:8. The next day, Agent Hauser attempted to find surveillance footage from the Harbor Freight store and the local police department, but there was none. *Id.* at 31:14-20, 83:20-84:10. Ultimately, he obtained permission from his supervisor to search Mr. McConnell's residence. *Id.* at 32:5-11.

Agent Hauser and three other agents – including Agent Eckenrod – executed a search of Mr. McConnell's home on Wednesday, October 2 at around 5:45 p.m. *Id.* at 32:18-20, 33:10-13, 84:11-17, 113:6-8. They handcuffed Mr. McConnell immediately upon entry. *Id.* at 33:16-20, 85:5-21. Agent Hauser then "let him know we would be searching the residence and asked him if he had any contraband," and Mr. McConnell responded, "I have airsoft rifles." *Id.* at 33:16-22. As part of a comprehensive search of the trailer, the agents entered a room labeled "Machine Shop." ECF 48-7, p. 1. There, they saw realistic-looking airsoft rifles, as well as firearms silencers, in plain view. ECF 48-6; ECF 48-7. Ultimately, they found a .22 caliber pistol with a loaded magazine, as well as ammunition, inside a dresser in that room. ECF 48-7, pp. 21-23; ECF 58, 39:3-5. After examining the firearm, the agents returned it to its place, and Agent Hauser contacted ATF for support. ECF 58, 40:21-41:1. An ATF team arrived on the scene, Mirandized Mr. McConnell, and obtained a waiver and consent to search the premises. *Id.* at 41:9-12. Mr. McConnell made several incriminating statements relating to the gun. ECF 44, ¶ 15. But the agents did not find any evidence of association with a child. ECF 58, 82:17-19.

## **DISCUSSION & ANALYSIS**

Mr. McConnell moves to suppress the physical evidence recovered during the search, as well as the incriminating statements he made to the agents. The Court finds that the search was based on reasonable suspicion and that its scope was permissible. Moreover, any *Miranda* violation at the outset does not provide a basis to suppress the physical evidence or the bulk of Mr. McConnell's statements.

4

I. **Agent Hauser had reasonable suspicion to search Mr. McConnell's home.**

In order to search Mr. McConnell's home, the parole agents needed to have reasonable suspicion of illegal activity or other violation of parole. *United States v. Baker*, 221 F.3d 438, 448 (3d Cir. 2000). Mr. McConnell argues that reasonable suspicion did not exist here because Agent Eckenrod's report was not credible, and because suspicion dissipated during Agent Hauser's subsequent investigation. The Court ultimately disagrees.

After examining the evidence and weighing the credibility of the witnesses who testified at the suppression hearing, the Court finds that Agent Eckenrod's testimony was partially credible. Though the Court finds it extremely unlikely that Mr. McConnell was in fact with a child on the day in question, it is plausible that Agent Eckenrod saw a child near Mr. McConnell in the store, even if he was mistaken as to whether the child was *with* Mr. McConnell.[4] However, after observing Agent Eckenrod's demeanor while testifying and comparing his account with other evidence submitted, the Court finds that parts of his story were, at best, embellished, or, at worst, fabricated to provide more supporting detail.[5] Accordingly, when evaluating

---

[4] The Court does not find it plausible that Agent Eckenrod would completely invent such an allegation. The defense alluded to two tense encounters while Agent Eckenrod was supervising Mr. McConnell, but did not show that any grudge existed between the two. *See* ECF 58, 106:11-22, 148:11-149:2. Moreover, those encounters occurred in or around October 2018; there were many subsequent months that Agent Eckenrod supervised Mr. McConnell without incident. *See id.* at 122:7-10. The encounter at Harbor Freight occurred on September 28, 2019. The timing thus does not suggest targeting or retaliation. Additionally, the Court finds it unlikely that Agent Eckenrod would implicate his colleagues in trying to carry out any sort of elaborate vendetta.

[5] For instance, it is implausible that Agent Eckenrod actually saw the McConnells load a child into their car, as Agent Eckenrod claimed. Mr. McConnell submitted a receipt showing that he in fact purchased an auger at Harbor Freight. Def.'s Ex. 3. An auger comes in a box that is over three feet long. ECF 58, 152:19-25. Mr. McConnell drove a Kia Soul, which is not a large vehicle. *Id.* at 152:2-4. Indeed, the seats needed to go "all the way forward and down" to fit the auger into the back seat,

5

the existence of reasonable suspicion, the Court will only consider the allegations it deems credible. *Cf. Franks v. Delaware*, 438 U.S. 154, 156 (1978) (excising false statements from an affidavit to determine if probable cause still existed).

Agent Hauser indicated that when he received the call from Agent Eckenrod, he "had no reason to doubt" his account. ECF 58, 93:9-12. This was especially true because Agent Eckenrod reached out soon after seeing Mr. McConnell and called Agent Hauser's personal number to reach him on the weekend. *Id.* at 28:21-24. Although the testimony was vague on the specifics of the phone call, the Court concludes from the testimony that Agent Eckenrod called Agent Hauser immediately, conveying the general message that Mr. McConnell was with a child. *Id.* at 28:25-29:4 ("He advised that he had seen Justin McConnell at the Harbor Freight store, and he was with a minor child."). Though Agent Hauser knew that Mr. McConnell had no previous violations and did not have access to his children, at bottom he weighed the firsthand account of a colleague more heavily. Further, he operated under the reasonable assumption that parolees are more likely to engage in criminal conduct than an ordinary member of the community. *See Samson v. California*, 547 U.S. 843, 849 (2006) (crediting the "assumption that, by virtue of his status, a probationer is more likely than the ordinary citizen to violate the law." (cleaned up)). Considering the totality of the circumstances, Agent Hauser had reasonable suspicion that Mr. McConnell had violated his parole.[6] *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

---

plus the insulation and other materials subsequently purchased at Lowe's. Def.'s Ex. 2. There is simply no room for a child in the back seat. ECF 58, 172:8-11. Moreover, from the testimony of both Mr. McConnell and Agent Eckenrod, Agent Eckenrod was close enough to Mr. McConnell's vehicle in the parking lot to have seen Mr. McConnell clearly, making it highly unlikely that he would genuinely mistake a large box for a child. *See id.* at 172:18-25, ECF 48-3, p. 6.

[6] Agent Hauser also would have had reasonable suspicion even if he had only considered Agent Eckenrod's allegations of seeing Mr. McConnell in line with a child

Mr. McConnell next argues that any reasonable suspicion dissipated after failed attempts to corroborate Agent Eckenrod's report. ECF 44, ¶ 22. The Court disagrees. First, additional evidence, though desirable, was not necessary to maintain reasonable suspicion here.[7] *United States v. Yusuf*, 461 F.3d 374, 385 (3d Cir. 2006) (unlike other informant tips, "information received from other law enforcement officials during the course of an investigation is generally assumed to be reliable"). Second, Agent Hauser's investigation did not yield evidence that convincingly *disproved* Agent Eckenrod's version of events. That is, just as there was no footage of Mr. McConnell *with* a child, there was no footage of him *without* a child. For his part, Mr. McConnell emphatically denied the allegations, both in his initial home interview with Agent Hauser and on the stand. *E.g.*, ECF 58, 177:1-10. And he had created a record of compliance and truthfulness with the agents. *Id.* at 81:14-21. But, at that time, Agent Hauser had been a parole officer for 11 years and had

---

and disregarded the rest of the report, because he was relying on the account of a trusted colleague and held an inherent suspicion of parolees.

[7] Mr. McConnell insinuates that the agents' lack of urgency and sub-par investigation is proof of lack of reasonable suspicion. *See* ECF 61, ¶¶ 9, 19. The Court agrees that many of the investigative choices were questionable. For instance, despite the seriousness of what he purportedly saw, Agent Eckenrod did not approach Mr. McConnell at any point, even though he was armed. ECF 58, 135:8-16. Nor did he call the police. *Id.* at 135:6-7. He did not even take a picture of Mr. McConnell with the child, though he had his cell phone out. *See id.* at 155:5-12, 173:1-5. Agent Hauser did not instruct him to do any of those things, either. *Id.* at 75:2-16. Instead, both men waited until the weekend was over to file a report and act on it. Indeed, Agent Hauser prioritized his office duty and waited until Monday *evening*, even though he could have asked another officer to cover for him. *Id.* at 76:14-25. When he finally visited Mr. McConnell, Agent Hauser did not conduct even a cursory search of the house or car, and he did not ask for video surveillance from an obvious source: Mr. McConnell's home cameras. *Id.* at 80:23-81:11, 81:22-82:6. Finally, the agents never took steps to identify the child. *Id.* at 112:4-6. Still, reasonable suspicion is measured objectively. *Whren v. United States*, 517 U.S. 806, 813 (1996). Here, an objective officer still would have had reasonable suspicion based only the firsthand account of a colleague parole agent.

supervised thousands of parolees. *Id.* at 6:23-25, 42:19-25. In his experience, parolees rarely admit openly to such a serious violation. *Id.* at 91:10-16. Thus, it was reasonable for him to take Mr. McConnell's denial (and his mother's) with a grain of salt.

Ultimately, the search took place 4.5 days after the Harbor Freight encounter and two days after Agent Hauser's solo visit. The Court finds that this interval was not long enough to render Agent Eckenrod's information stale. Reasonable officers may have believed that evidence of the alleged parole violation (contact with a child) would still be present at that time. *United States v. Strickland*, 237 F. App'x 773, 778 (3d Cir. 2007). For example, even if a child were no longer present, a search might still have yielded children's items or home camera surveillance.

Thus, Agent Hauser had reasonable suspicion to search Mr. McConnell's home.

## II. The scope of the search was proper.

Mr. McConnell also argues that searching his house was improper, and that agents exceeded a reasonable scope when they entered the "Machine Shop" room and searched the dresser inside. These arguments fail, for at least three reasons.

First, Mr. McConnell contends that there was no 'nexus' to justify a search of Mr. McConnell's residence at all, because Agent Eckenrod's report did not allege that he took a child home or even drove in that direction. ECF 61, ¶ 19. But he was seen on a weekend at a home improvement store purchasing an item for a home project; therefore, he presumably would eventually return home with whatever was in the car. If Mr. McConnell had indeed been associating with a child at and around that time, it was reasonable to assume that evidence of the child, or even the child itself, might be at his residence.

Second, Mr. McConnell argues that it was unreasonable for agents to enter the Machine Shop because it is not a room where one would expect to find a child. *Id.* at ¶ 38. But common sense says that items (or people) that belong in one room of a

8

house often end up in another – particularly where, as here, the home is a small trailer. And, of course, a child could be held against their will in any room. Therefore, when reasonable suspicion exists that a child or evidence of a child is somewhere in the house, affixing a label to a door is not a talismanic way to foreclose searching that room.[8]

Third, Mr. McConnell asserts that once inside the Machine Shop, the agents could not permissibly search the dresser within, since a child could not fit inside a drawer. *Id.* at ¶ 39. But, upon entering the room, silencers were in plain view.[9] ECF 48-7, pp. 12-14. These silencers generated new reasonable suspicion that non-airsoft firearms and/or ammunition were in the home, and those could certainly be found inside a dresser drawer.

Accordingly, the scope of the search, including the Machine Shop and dresser, was proper.

### III. The parole agents' initial questioning violated Mr. McConnell's *Miranda* rights, but the Court will only suppress one statement.

Mr. McConnell argues that the parole agents' initial questioning violated his Fifth Amendment rights because they did not issue *Miranda* warnings even though

---

[8] Mr. McConnell makes two additional arguments. He characterizes the agents' actions as an impermissible 'general search.' ECF 61, ¶ 12. He also asserts that because he was not properly Mirandized before initially mentioning the airsoft rifles, his statement cannot serve as the basis to expand the scope of the search to look for weapons violations. *Id.* at ¶ 31. The Court need not address these points, because it was proper for agents to enter the Machine Shop to look for a child or evidence thereof. This would be true even if Mr. McConnell had not mentioned that he had airsoft rifles when the officers cuffed him upon entry.

[9] The parties dispute whether possession of airsoft rifles – also in plain view – constituted violations of Mr. McConnell's parole. The Court need not decide this issue, because the silencers alone were sufficient to expand the scope of the search. Silencers are usually used with actual firearms, which indisputably would have been parole violations. ECF 48-4, p. 2.

he was in custody. ECF 61, p. 24. The Court agrees, but will only suppress one (largely innocuous) statement.

Agent Hauser and his colleagues immediately took Mr. McConnell into custody by putting him in handcuffs at the threshold of the home.[10] They did not issue him *Miranda* warnings at that time. *See* ECF 58, 33:16-20. Instead, they asked him if he had any contraband. *Id.* This express question constitutes custodial interrogation, squarely within the purview of *Miranda*. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.").

The government argues that the public safety exception applies. ECF 62, p. 8. But that is intended to be "a narrow exception to the *Miranda* rule[.]" *New York v. Quarles*, 467 U.S. 649, 657-58 (1984) (applying public safety exception when police "in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in [a] supermarket"). Here, Agent Hauser did not ask about "weapons" or "anything that could hurt" the search team. Instead, his use of "contraband" – when the broader purpose of the search was to uncover parole violations – suggests an investigative purpose, rather than a concern for safety. *Id.* at 659 (explaining that the public safety exception distinguishes between "questions necessary to secure [officers'] own safety or the safety of the public and questions designed solely to elicit testimonial evidence

---

[10] The government does not seriously contest that Mr. McConnell was in custody here. *See* ECF 62, p. 8. Though Mr. McConnell was in his home, the handcuffs "deprived [him] of his freedom of action in [a] significant way." *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984). *Compare United States v. Mesa*, 638 F.2d 582, 586 (3d Cir. 1980) (suspect was not in custody when officers "had no power to handcuff him or use other reasonable means to confine him in such a manner that he had no choice but to listen to questioning").

10

from a suspect"). Indeed, the agents' suspicion centered on alleged association with a child, not weapons. And based on Mr. McConnell's parole conditions, "contraband" would have included a wide range of items, such as things designed to appeal to children, duct tape, a pet, and photography equipment. ECF 48-5, pp. 3, 9. None of these would have posed any danger to the agents. Moreover, Mr. McConnell was already handcuffed, which is another indication that there was no exigency. *Compare United States v. Duncan*, 308 F. App'x 601, 606 (public safety exception applied where suspect kept moving his arms and reaching toward his pocket).

Because this initial questioning violated Mr. McConnell's Fifth Amendment rights, his first statement (*i.e.,* "I have airsoft rifles") cannot be used in the government's case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) (citing *Harris v. New York*, 401 U.S. 222 (1971)).

This *Miranda* violation, however, does not mean that all subsequent evidence must be suppressed as fruit of the poisonous tree. As discussed above, the physical evidence would have been discovered even if Mr. McConnell had remained silent. *Cf. Nix v. Williams*, 467 U.S. 431 (1984) (outlining the 'inevitable discovery' exception to the exclusionary rule). And he waived his *Miranda* rights before making additional statements about the evidence discovered. ECF 48-8. Mr. McConnell does not challenge the validity of the waiver, nor does he allege that any of his statements were involuntary. *See* ECF 44; *Elstad*, 470 U.S. at 309 (declining to suppress subsequent, warned statements where there was "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will …. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.").

Therefore, neither the physical evidence nor Mr. McConnell's post-waiver statements are subject to suppression.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Mr. McConnell's motion to suppress, except as to his initial statement regarding having airsoft rifles in the home. An order follows.

DATE: April 15, 2022                  BY THE COURT:

/s/ *J. Nicholas Ranjan*
United States District Judge